[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The complaint in this action is in two counts and in it the plaintiff Blue Cross/Blue Shield ("BC") seeks money damages from the defendant, R.W.L. Corporation ("RWL"). The first count alleges a breach of contract by RWL of a group medical insurance benefit policy issued to RWL by BC. The alleged breach is RWL's failure to pay agreed-upon premiums for which BC claims it is owed $26,552.22. The second count, alleging that BC has provided medial insurance benefits and coverage to RWL's members at RWL's requests pursuant to the group policy for which RWL knew that BC reasonably expected to be paid, maintains RWL's refusal to pay for the same constitutes unjust enrichment to RWL.
RWL, while admitting it entered a group medical insurance benefits policy with BC on or about January 1, 1989, denies all the essential allegations of both counts including the allegations that it failed to pay its monthly premiums of October 1, 1989, November 1, 1989, and December 1, 1989, as well as claimed arrearages for July, August and September 1989. By way of special defenses RWL alleges that (1) BC breached its obligation under the contract by cancelling the policy involved and afforded no coverage to its employees although RWL had paid the agreed-upon premiums, and (2) although Blue Cross had informed RWL that RWL only owes it $2,920.56, RWL denies that it even owes that amount. At the trial RWL also raised the defense of the Statute of Frauds which can be taken advantage of under a simple denial. See Bolmer v. Koset,6 Conn. App. 595, 615 (1986); Practice Book, p. 164.
In addition, RWL has filed a counterclaim in four counts. The first count alleges that on or about January 1, 1989, RWL and BC did enter a group medical insurance benefits policy, that RWL represented to its employees that they were covered by that policy, that in August 1989 BC wrongfully and without cause terminated that contract with RWL although the premiums were paid, that although claims were submitted to BC by RWL employees, BC neglected and refused to honor its obligations under the contract, and that as a result RWL had to pay medical claims of employees which claims were not honored by BC. The second count alleges essentially that because of BC's failure to provide coverage under its contract, that BC breached its implied duty of good faith and fair dealing to the damage of RWL. The third count alleges that if BC is permitted to retain the benefits of premiums received without affording the agreed-upon coverage, that BC will be unjustly enriched. The fourth count maintains that as a result of BC's breach, the morale CT Page 3296 of RWL's workforce suffered causing RWL embarrassment, loss of good will of its employees, and diminished production efforts by its employees.
Blue Cross claims (1) that a valid contract existed between Blue Cross and RWL until January 1, 1990 under which RWL owes it $26,552.22 in unpaid premiums. RWL does not agree and maintains that Blue Cross cancelled and/or terminated their group coverage of RWL's employees by their cancellation of coverage letters sent to each and every one of RWL's forty-odd employees who were located in four different plants in four different states. Blue Cross says that there was no cancellation and/or termination of the group coverage because Blue Cross "was operating under a misconception that the premiums for August and September of 1989 were unpaid." In support of this position Blue Cross refers to "correspondence" to RWL, dated September 22, 1989 to [RWL] making clear that Blue Cross . . . considered the policy reinstated as of September 30, 1989" as well as referring to other correspondence and conduct between the parties. Blue Cross also points to certain evidence it claims shows that "defendant's [RWL] employees continued to submit claims to Blue Cross . . . until January 1, 1990", suggesting that the employees of the defendant considered the policy to be in full force and effect.
RWL's response is essentially three-fold First, Blue Cross breached the contract by cancelling and/or terminating coverage for allegedly unpaid premiums although RWL had already paid its premiums as agreed. Second, some period of time after January 1, 1990, actually in June 1991, Blue Cross told RWL it owed only $2,920.56, but RWL now denies it even owes Blue Cross that reduced amount. Third, the Statute of Frauds, i.e., § 52-550(2) and (5) bars Blue Cross' recovery.
Here we note the matter of credibility which was important in this case. There were serious conflicts in the evidence. BC produced one witness, James Stackpole, an employee who was assigned to collect the RWL account, although it did call Marcia Lahner LaFemina, the vice president of the defendant RWL. Ronald Lahner, Mark Lahner, Lisa Bruno-Mulvey and LaFemina testified for RWL.
The trier of fact determines the credibility of the witnesses and the weight to be accorded their testimony and, where the evidence is conflicting, its probative force is for the trier to decide. Robert Lawrence Associates, Inc. v. DelVecchio, 178 Conn. 1,145 (1979); Steinman v. Maier, 179 Conn. 574, 576 (1978). It CT Page 3297 may also draw reasonable inferences from the evidence. Swifts Co.v. Reston Inc., 187 Conn. 540, 542 (1982). The factfinder has "the unique opportunity to view the evidence in a totality of circumstances including its observations of the demeanor and conduct of the witnesses and the parties. . . ." Sportsman's BoatingCorporation v. Hensky, 192 Conn. 747, 750 (1984), quoting fromKaplan v. Kaplan, 186 Conn. 387, 391 (1982); Solomon v. Hall-BrookeFoundation, Inc., 30 Conn. App. 136, 141 (1973). It may also consider the interest of any witness in determining credibility.Buonano v. Cameron, 131 Conn. 513, 515 (1945). Our Supreme Court has said that "It is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct. Findings based upon these observations in the courtroom are in the same category as findings based upon a view of premises or property. Such evidence is as properly to be considered by the court in rendering its decision or making its finding as if presented by the lips of witnesses." Dadio v. Dadio,123 Conn. 88, 93 (1937); Auger v. Auger, 133 Conn. 211, 213-214
(1946). The trier may accept or reject the testimony of a witness, offered by one party or the other, expert or otherwise, in whole or in part. Crest Plumbing Heating Co. v. DiLoreto, 12 Conn. App. 468,476 (1987); Barrilla v. Blake, 190 Conn. 631, 639 (1983). Uncontradicted testimony does not because it is uncontradicted become admitted or undisputed, nor does the strength of a witness's belief raise it to that level. Stanton v. Grigley, 177 Conn. 558,563 (1979).
Certain findings of fact can be made at the outset on the credible evidence. The contract admittedly entered into between BC and RWL on or about January 1, 1989 provides that the policy ". . . will continue until the following January 1, 1990, when, unless terminated as provided by this policy, it will renew for a period of 12 consecutive months and thereafter, from year to year. . . ." RWL, at all relevant times, had four separate corporations it controlled which operated under the RWL umbrella. These four corporations had, in total, some forty-eight employees who were covered under the BC group policy contract. These employers worked for RWL at four plant locations at plants in Connecticut, Pennsylvania, Michigan and California. Ronald W. Lahner was the President, CEO and sole director of RWL. Marcia Lahner-LaFemina ("LaFemina") is vice-president of RWL and was in charge of all matters pertaining to insurance contracts of RWL at all times relevant to this case. Lisa Bruno-Mulvey ("Mulvey"), a former employee of RWL, worked for RWL from January 1989 through July 1, CT Page 3298 1991. Her duties while at RWL were confined to accounts payable. Mark E. Lahner is the supervisor of production for RWL. James Stackpole has been a collection and credit specialist for BC for the past three years. Prior to that he was a fraud investigator at BC for five years. He was assigned to collect the moneys allegedly to BC by RWL in this case.
On or about September 6, 1989 on the first day back to work after the Labor Day weekend, LaFemina became aware that BC had sent a notice[1] to RWL employees that their BC group health insurance had been cancelled by BC. She learned this at that time when she began receiving telephone calls from RWL plant supervisors and other RWL employees inquiring about the situation. At that time she knew nothing about it (and she did not) but told them that she would check. LaFemina herself did not receive any such cancellation notice as she was not covered by the RWL group plan but by another plan under her husband's health coverage. Actually, LaFemina did not receive from BC any notice of this cancellation other than from RWL plant supervisors or employees. Ronald Lahner, who was the President, CEO and sole director of RWL, received a BC cancellation notice at his home in Madison. His son Mark Lahner who was the plant supervisor in California received such a notice in that state. LaFemina did check and, as a result, she informed plant supervisors and employees that any medical bills they incurred were to be sent to her at RWL in New Haven and not to BC. Some such bills were so sent to LaFemina and RWL did make some payment.
This cancellation by BC of the RWL group coverage policy was, according to the credible evidence, because of RWL's failure to pay their premiums necessary for coverage through September 30, 1989. The cancellation notice sent by BC to every heretofore-covered RWL employee was definite and certain despite some claim by BC to the contrary. Any fair reading of it leads to that conclusion. It is, of course, axiomatic that notice of cancellation should be definite and certain. See Bessette v. Fidelity Casualty Co., 111 Conn. 549,556 (1930). Ambiguities, if any, and we see none, should be resolved in favor of the insured. See DiProspero v. NationwideMutual Fire Ins. Co., 30 Conn. Sup. 291, 297 (1973). We note that the notice given RWL employees by BC starts by saying "Now that your Blue Cross Blue Shield coverage is no longer being paid through your employer's group, we are offering you the opportunity to continue your group coverage for the period shown on the enclosed notice [which is not in evidence] and to convert your coverage to one of our direct payment plans. The enclosed notice represents the amount you must pay if you wish to continue your CT Page 3299 coverage. . . ."
It is appropriate to point out here that BC argues that there was no actual rescission of the contract. There it claims thatGordon v. Indusco Management Corporation, 164 Conn. 262, 264 (1973) makes clear that "a rescission is effective when, in addition to a restoration of the status quo, an intention on the part of both parties that the contract be rescinded exists." It goes on to say that the evidence is such that neither party intended a rescission, that BC continued to pay claims of RWL employees with RWL condonation and, so, after their unilateral "reinstatement" the group policy "continued in force." In making this argument, it trivializes the absolute and unequivocal notice of its cancellation notices as well as resting such action on their "misconception" of RWL's premium-paying status. In insurance law the term "`cancellation' refers to the termination of a policy by act of either or both parties to it prior to the ending of the policy period." Morey v. Educator Insurers Inc., 342 N.E.2d 691, 696
(Ohio 1976). The conduct and actions of the parties must be examined. The credible evidence which is not the version BC contends for shows that BC did breach the contract and did unequivocally act in cancelling it so that RWL was "entitled to regard the contract as discharged . . . and at an end." See Vesce v.Lee, 185 Conn. 328, 334 (1981); O'Keefe v. Bassett, 132 Conn. 659,663 (1946).
At the time BC cancelled the RWL group insurance policy that conduct terminated the group policy contract [in Exhibit A] and that, therefore that contract which was entered into on or about January 1, 1989 was no longer binding on either BC or RWL. This is RWL's position. It is not BC's position. In maintaining its position BC argues in its brief that it was clear at trial that BC ". . . was operating under a misconception that the premiums for August and September of 1989 were unpaid." (underlining added). Actually, the evidence at trial proved that RWL had timely sent a check paying for that period. The fact is that BC misapplied that check to a completely different account and then sent out the cancellation notices. The "misconception" for which BC argues was not as it claims mutual. Despite having sent out these unequivocal notices, BC still claims that because neither it nor RWL ever intended to terminate the group, it was quite legal for it to regard the original group policy as viable because it "reinstated" that coverage. Here BC points to its reinstatement letter dated September 21, 1989 to LaFemina which ". . . will confirm the reinstatement of your company's Blue Cross Blue Shield CT Page 3300 coverage . . . with a paid through date of September 30, 1989." RWL admits receiving this letter but it disagrees that it constitutes the reinstatement of coverage viability that BC claims. This unilateral "reinstatement", under the circumstances, does not restore the contractual status quo ante as BC claims.
There is additional credible evidence that RWL regarded the contract at an end as stated. BC argues that "there never was any action taken by RWL Corporation to signal any intention not to fulfill its obligation under the contract." It is difficult to understand why RWL's not "paying" three consecutive months premiums does not constitute more than a flickering signal that RWL regarded the contract at an end, i.e. for October, November and December of 1989. Again, there is no credible evidence of any real contact between BC and RWL after September 30, 1989 until sometime about mid-December 1989 concerning unpaid premiums. Moreover, BC, in its post trial brief, despite their claim of a valid reinstated contract never answers or refers to certain documentary printed evidence on their own claim form employed during the contested period of "No coverage for services incurred after the membership cancellation date." There is no credible evidence that LaFemina or anyone from RWL spoke to BC after September 30, 1989 about coverage. During that period LaFemina was endeavoring to get insurance coverage from other carriers.
There was some evidence that LaFemina did speak to a person or persons named Glick. The evidence about them is scanty. The Glicks were apparently associated with an entity called Consolidated Financial Resources and were said to be BC's "representative" to help straighten matters out. What the Glicks did, if anything, or when they did it, is not disclosed by the evidence.
Further, there is no reference in BC's post-trial briefing of the telling evidence of Lisa Bruno-Mulvey, a former employee of RWL. Mulvey was employed by RWL from early 1989 through July 1, 1991 where she handled accounts payable. Her testimony is revealing on the overall issues of how the parties comported themselves vis a vis their interaction after September 30, 1989. She and one Marcia Cooke, a BC employee in its marketing department, were, over a period of time, involved in the matter of moneys allegedly owing by RWL to BC. Mulvey said no one from Blue Cross ever claimed to her that RWL owed BC for premiums for RWL group insurance for the last three months of 1989. Mulvey, however, did, on June 25, 1991, received at RWL a four-page FAX CT Page 3301 transmittal from Marcia Cooke at BC entitled "Outstanding Miscellaneous Bills." This FAX over Cooke's signature noted that it was "Re: Miscellaneous Bills prior to Cancellation of Group." (underlining added). It set out a total of $2920.56 due for the following months July 1989 — $173.04, August 1989 — $773.40 and September 1989 — $1974.12."
Insofar as under the first count of its complaint BC claims that it has proven that a valid group insurance contract existed with RWL until it was terminated on January 1, 1990, BC has not sustained its burden of proof. The court finds that BC terminated and/or cancelled the contract referred to in the first count so that it was non-existent after September 30, 1989. There was no contract at all between the parties during the months of October 1989, November 1989 or December 1989. However, there was a valid contract before that date and BC is entitled to recover under the first count the sum of $2,920.56 for the miscellaneous bills owing prior to September 30, 1989 for the months of July 1989, August 1989 and September 1989, having sustained its burden of proof as to that. None of the applicable special defenses are found to prevail against the recovery of this $2,920.56 of BC under the first count.
Going on, we examine the second count of BC's complaint under which BC argues it can recover under either a theory of unjust enrichment (which it specifically alleges in those very words) or quantum meruit. After examining the second count we construe them as alleging both these remedies. "Both unjust enrichment and quantum meruit are doctrines allowing recovery on the theory of restitution, that is, the restoration to a party of something of which he was deprived because of the unjust enrichment of another at his expense. See G. Palmer, 1 Restitution (1978) § 1.1." Burnsv. Koellmer, 11 Conn. App. 375, 383 (1987). "Quantum meruit is the remedy available to a party when the trier of fact determines that an implied contract for services existed between the parties, and, that, therefore, the plaintiff is entitled to the reasonable value of the services rendered. Rossetti v. New Britain, 163 Conn. 283,292 (1972)." Id.
Turning first to unjust enrichment, that doctrine "is a very broad and flexible equitable doctrine . . . which has as its basis that it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff." Bolmer v. Kocet, 6 Conn. App. 595, 612 (1986). Its three basic requirements are (1) that the defendant was benefited by the plaintiff; (2) an appreciation or knowledge by the defendant CT Page 3302 of that benefit; and (3) that acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. 12 Williston on Contracts (3d ed. Janger) § 1479, p. 276; Burns v. Koellmer, 11 Conn. App. 375, 384 (1987); Polevari v.Pratt, 29 Conn. App. 191, 203 (1992); Providence Electric Co v.Sutton Place Inc., 161 Conn. 242, 246 (1971); Cecio Bros. Inc. v.Greenwich, 156 Conn. 561, 564 (1988); CBS Surgical Group v. Holt etal., 37 Conn. Sup. 555, 558 (1981). A person is enriched if he or she has received a benefit. See Restatement of Second Restitution § 1, comment c; Restatement of Restitution § 1, comment a (1927). To prove an unjust enrichment claim it is necessary to prove not only that one has received a benefit but also that the enrichment is such that in equity and good conscience its retention would be unjust. See, e.g., Garwood Sons Construction Co. v. CentosAssociates Limited Partnership, 8 Conn. App. 185, 187 (1986);Montanaro Bros. Builders Inc. v. Snow, 4 Conn. App. 46, 53 (1985);Moyer v. Bishop, 551 N.Y.S.2d 673, 675 (1990); Meehan v. ChettenhamTownship, 189 A.2d 593 (1963-Pa.); Efco Importers v. Halsobrunn,500 F. Sup. 152, 157 (1980-E.D. PA.).
In its brief BC argues that RWL "was benefited to the extent that its employees and agents were provided with health insurance benefits for the three months in question. The provision of health insurance benefits promoted good will and productivity at the defendant's place of business. By any stretch of the imagination, the defendant received a benefit, whether tangible or intangible. Further, Marcia Lahner-LaFemina testified that she promised to pay the debts of the employees during the three months in question. Therefore, the defendant also has been benefited by not having to pay for those medical bills that were reimbursed by Blue Cross and Blue Shield."
On the other hand, RWL disputes any liability on it for unjust enrichment. It argues that BC had to prove that it conferred a benefit upon RWL, that RWL had knowledge of the benefit and that RWL accepted the benefit under circumstances so as to make it unjust or inequitable for RWL not to pay for the benefit. RWL goes on to maintain that there was no proof as to the value of the "benefit" to it, no proof that it had knowledge of the alleged benefit and that it never accepted benefits. The benefits, if any, were accepted by the providers of the medical services to RWL employees. Moreover, RWL contends that there was no showing of the value of any of the benefits conferred upon RWL employees. CT Page 3303
RWL claims there can be no "benefit" because there is no evidence that RWL ever knew that BC was paying any of the claims involved when it was paying them. There is no such evidence. There was no ongoing contract after September 30, 1989. There is no evidence that during the three month period of October through December 1989 there was any contact to alert RWL between RWL and BC that BC had paid claims. To be sure, LaFemina was contacted by either Mr. or Mrs. Glick to whom BC had directed her early to resolve the issue of moneys allegedly owed BC. There is no evidence as to the amount of moneys claimed insofar as the Glicks might have been concerned as to any moneys alleged to have been due BC from RWL. As already noted, the evidence about the Glicks and/or Consolidated Finance Corporation (with whom the Glicks apparently were associated) is extremely sparse and is entitled to little credibility.
Further, contrary to BC's claim, Marcia Lahner LaFemina did not promise to pay the debts of the employees during the three months in question." The court agrees. No such promise has been proven by BC.
BC claims that RWL "knowingly" accepted the services because RWL knew that the policy was reinstated and that BC would be providing health insurance to RWL employees which RWL allegedly accepted "in silence". We have already discussed the reinstatement claim as well as the lack of knowledge by RWL that BC was "providing" such services during the contested three month period. We reiterate that the credible evidence does not show such knowledge nor acceptance of the claimed benefits by RWL. Parenthetically, there is no claim of fraud in this case. It is necessary under the doctrine of unjust enrichment to show that the defendant was benefited, that is, that it has received something of value. See, e.g., Providence Electric Co. v. Sutton Place,161 Conn. 242, 246 (1971). Here the plaintiff argues that RWL was benefited in that its employees were provided health insurance benefits for the three months in question and that so doing "promoted good will and productivity at the defendant's place of business." As to the latter there is no credible evidence. As to the former, the circumstance of RWL, as disclosed by the credible evidence, show that has not been proven. Some of those circumstances have already been set out. Here, however, we point out that as to the three months involved, RWL had undertaken to accept directly the responsibility for employees' health care expenses while at the same time actively trying to obtain new health insurance coverage. RWL actually paid moneys out pursuant CT Page 3304 to this undertaking. In addition, BC did not indicate to RWL that it was furnishing health insurance to RWL employees. Actually, there is no evidence that any RWL employee indicated to or informed RWL that BC was still furnishing such coverage. While LaFemina received the October 1, 1989 billing from BC as the billing cycle was monthly, RWL did not pay it because of its position on the express contract as referred to. More to the point, RWL did not receive any billings from BC for the November and December cycles until about mid-December 1989. There is nothing in the interim to demonstrate action by BC concerning "unpaid premiums" until the unsigned BC letter of December 19, 1989, "terminating" the group policy as of December 31, 1989, "Due to non-payment of premium." Moreover, RWL's conduct was neither tortious or fraudulent. SeeParamount Film Distributing Corp. v. State, 30 N.Y.2d 415, 421,264 N.E.2d 695 (1972) (notes that "whether the defendant's conduct was tortious or fraudulent" is one of a number of the "broad considerations of equity and justice" generally relevant to a claim of unjust enrichment).
It is concluded that BC has not sustained its burden of proof on its claim of unjust enrichment under the second count of the complaint. Neither the facts found and/or equity and justice require a contrary conclusion.
We now take up BC's claim that it is entitled to recovery on the second count alternatively on the doctrine of quantum meruit. "Quantum meruit is the remedy available to a party when the trier of fact determines that an implied contract for services existed between the parties, and that, therefore, the plaintiff is entitled to the reasonable value of services rendered. [citation omitted] Such contracts are determined from evidence of the parties' course of conduct which implies a promise to pay for the services rendered. The pleadings must allege facts to support the theory that the defendant by knowingly accepting the services by the plaintiff and representing to the [plaintiff] that [the plaintiff] would be compensated in the future, impliedly promised to pay [the plaintiff] for the services [the plaintiff] rendered. [citation omitted]." Burns v. Koellmer, 11 Conn. App. 375, 383 (1987). "An implied contract is an agreement between the parties which is not expressed in words but which is inferred from the acts and conduct of the parties [citations omitted]. The test is whether the conduct and acts of the parties show an agreement. [citation omitted]." Brighenti v. New Britain Shirt Corporation, 167 Conn. 403,406 (1974). CT Page 3305
In passing upon this theory there is no necessity to repeat the circumstances disclosed above by the credible evidence. In that regard we have earlier set out in detail the acts and the conduct of the parties including their knowledge. We conclude that the plaintiff BC has not sustained its burden of proof of proving its entitlement to recover on quantum meruit.
Accordingly, judgment is entered on the second count in favor of the defendant RWL.
Finally, we take up the counterclaim filed by RWL. The first count alleges that BC wrongfully and without cause terminated its contract with RWL for unpaid premiums (although they had been paid) and that, as a result, RWL was obligated to spend moneys on account of medical claims incurred by employees whose medical claims were not honored by BC. We understand "wrongfully" to fall within the definition that "conduct to be legally wrongful must contravene some duty which the law attaches to the relation between the parties. . . ." Duncan v. Lumbermen's Mut. Casualty Co., 23 A.2d 325,326 (N.H. — 1941). It is clear from what has already been said that BC "wrongfully" terminated and/or "cancelled" the RWL policy.
In terms of documentary evidence supporting this claim of RWL, there is a billing paid in the amount of $286.00. Another bill claimed to have been submitted and rejected was for $451.81. This bill itself was not admitted into evidence as although it was the dollar figure on the alleged submitted claim there was no back-up information to show that it would be for a "covered" service. Nevertheless, LaFemina said that RWL had paid that amount. In addition, a number of documents for alleged claims by employees to BC, which were claimed to have been paid by RWL, were excluded because back-up to show that each was in fact for services actually covered by the BC policy did not accompany the proffered documents. The point in referring to this material here is that while no allowance can be made for any of them by way of damages, it is relevant on RWL's credibility on its overall claim in this case that it did expend moneys as it claims and further, in the court's opinion, it goes to the equities to be considered. However, we do find the issues on the first count of the counterclaim and find that RWL is to be awarded $286.00 in damages as against BC.
As to the second, third and fourth counts of the counterclaim, we find that the defendant RWL has not sustained its burden of proof on any of those counts and judgment on each of those counts is entered in favor of the plaintiff BC. CT Page 3306
To summarize: Judgment on the first count of the complaint is entered that the plaintiff BC recover of the defendant RWL for damages of $2,920.56; judgment on the second count of the complaint is entered for the defendant RWL; judgment on the first count of the counterclaim is entered that the defendant RWL recover of the plaintiff BC damages of $286.00; and judgment on the second, third and fourth counts of the counterclaim is entered in favor of the plaintiff BC.
Arthur H. Healey State Trial Referee